**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

———————————————————————

THOMAS BAKER, SEAN BAILEY,　　　　)
NICOLE BOLDEN, ALLISON　　　　　　)
NELSON, MEREDITH WALKER,　　　　 )
individually and on behalf of all others　)
similarly situated,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　No.  4:16-cv-1693
　　　　　　　　Plaintiffs,　　　　　　 )
　　　　　　　　　　　　　　　　　　　)　　　(Jury Trial Demanded)
v.　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
THE CITY OF FLORISSANT　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　 )

———————————————————————

## FIRST AMENDED CLASS ACTION COMPLAINT

### Introduction

1.　　　The Plaintiffs in this case are all impoverished Missourians who were jailed by the City of Florissant because they were unable to make a monetary payment to the City arising from traffic tickets or other minor municipal offenses. In each instance, the City kept a human being in its jail solely because the person could not afford to pay for their release. Each was held in jail indefinitely without either the legal representation or the inquiry into their ability to pay guaranteed by the United States Constitution. Instead, they were threatened, abused, and left to languish in confinement until their frightened family members produced enough cash to buy their freedom, or until City jail officials decided, days or weeks later, to release them free of charge—after it had become clear the City would not be able to extract any money from them.

2.　　　The City's modern debtors' prison scheme has been increasingly profitable to the City of Florissant, earning it millions of dollars over the past several years. It has devastated the

poor in the City and surrounding area, trapping people for years in a cycle of increased fees, debt, extortion, and cruel jailings. Thousands of people like the Plaintiffs take from their disability checks or sacrifice money that is desperately needed by their families for food, diapers, clothing, rent, and utilities to pay ever-increasing court fines, fees, costs, and surcharges arising from minor offenses. They are told by City officials that if they do not pay, they will be thrown in jail. The cycle repeats itself, month after month, for years.

3.      The treatment of Thomas Baker, Sean Bailey, Nicole Bolden, Allison Nelson, and Meredith Walker reveals systemic illegality perpetrated by the City of Florissant against some of its poorest people. The City has engaged in the same conduct, as a matter of policy and practice, against many other impoverished human beings on a daily basis for years, unlawfully jailing people if they are too poor to pay. The result is an abusive system that flagrantly violates the basic constitutional and human rights of our community's most vulnerable people.

4.      Once locked in the Florissant jail, impoverished people who cannot afford to pay the City endure grotesque treatment. They are kept in overcrowded cells; they are denied toothbrushes, toothpaste, and soap; they are subjected to the constant stench of excrement and refuse in their congested cells; they are kept in the same clothes for days and weeks without access to laundry or shoes or underwear; they step on top of other inmates, whose bodies cover nearly the entire uncleaned cell floor, in order to access a single shared toilet that the City does not clean; illnesses and even infected wounds go untreated and uncovered; they endure days and weeks without being allowed to use the moldy shower; they are housed in short-sleeve jump suits; shoes and flip-flops are not permitted, so those who are not arrested in socks go barefoot on the dirty cement floor; they huddle in cells kept intentionally cold in order to quiet detainees, forced to retreat under  a single thin blanket as they beg guards for warmer coverings; they are

not given adequate hygiene products for menstruation; they are routinely denied vital medical care and prescription medication, even when their families beg to be allowed to bring medication to the jail; they are provided food so insufficient and lacking in nutrition that inmates lose significant amounts of weight; they suffer from dehydration out of fear of drinking foul smelling water dispensed from an apparatus covered in blood and mucus on top of the toilet, without sufficient pressure to drink from without pressing their lips to the contaminated apparatus; and they must listen to the screams of other inmates languishing from unattended medical issues as they sit in their cells without access to books, or legal materials.  Perhaps worst of all, they do not know when they will be allowed to leave their disorienting and timeless cage, deprived of windows and perpetually flooded in florescent light.

5.     These physical abuses and deprivations are accompanied by other pervasive humiliations. Jail guards primarily ignore, but also routinely taunt impoverished people when they are unable to pay for their release.

6.     The City applies its scheme broadly, making jail or payment virtually unavoidable for the area's poor. Florissant is the largest municipality in St. Louis County by population, and the eighth largest by area. Florissant has a population of 51,812 according to the 2010 U.S. Census. In 2015 alone, the City of Florissant issued 28,436 arrest warrants, equaling an average of 1.3 arrest warrants *per household* and almost 0.79 arrest warrants *for every adult*, mostly involving unpaid debt for municipal violations. Between 2011 and 2015, the City of Florissant filed 151,026 new cases. During that same period Florissant generated between 13.2 and 14.5 million dollars in revenue through its municipal court, thus averaging of 2.65 – 2.9 million dollars per year, accounting for over 12 percent of the City's net revenue.

7.     City officials and employees—through their conduct, decisions, training and lack of training, rules, policies, and practices—have built a municipal scheme designed to brutalize, to punish, and to profit from low-income, predominantly minority drivers. Until 2015, the prosecutor in the City of Florissant was the judge in the City of Ferguson, whose municipal court practices and policies were highlighted in ArchCity Defenders' 2014 report as well as the Department of Justice's 2015 report.[1]  Additionally, the architecture of this illegal scheme has been in place for nearly 50 years.[2]

8.     By and through their attorneys and on behalf of a class of similarly situated individuals, the Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the violations that they suffered and for payments wrongly extracted, injunctive relief assuring that their rights will not be violated again, and a declaration that the City's conduct is unlawful. In the year 2016, these practices have no place in our society.[3]

## Nature of the Action

9.     It is and has been the policy and practice of the City of Florissant to jail people who cannot afford to pay cash bonds and debts owed to the City resulting from traffic tickets and

---

[1] *See, Municipal Courts White Paper*, ArchCity Defenders, Thomas Harvey et al (November 23, 2014) (*available at* http://www.archcitydefenders.org/archcity-defenders-municipal-courts-whitepaper-2/); *Investigation of the Ferguson Police Department*, United States Department of Justice, Civil Rights Division (March 4, 2015).

[2] *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 93 (1966) ("Our municipal jails are, in almost every case, nothing but calabooses suited at best for temporary detention. The worst of them are comparable with medieval dungeons of the average class; they are the shame of our cities."); *id.* at 88 ("[I]t seems that many citizens of the state are being confined needlessly in our city jails….."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id*. at 90 ("It is clear that many municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability….").

[3] The Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

other minor offenses, without conducting any inquiry into each individual's ability to pay and without considering alternatives to imprisonment as required by federal and Missouri law.

10.     It is and has been the policy and practice of the City to jail indigent people for failure to pay debts owed to the City, without informing them of their right to counsel and without otherwise providing adequate counsel.

11.     It is and has been the policy and practice of the City to hold indigent inmates in the City jail indefinitely, unless and until the inmates' families or friends make monetary payments sufficient to satisfy the City. It is and has been the policy and practice of the City to bargain with inmates and their families on an amount of money that the City will accept in exchange for the inmate's release.

12.     It is and has been the policy and practice of the City to arbitrarily and incrementally reduce the amount of money required for release throughout a person's indefinite detention, eventually releasing the person for free if the City determines it is unlikely to profit from further detention.

13.     It is and has been the policy and practice of the City to issue and enforce invalid arrest warrants; to threaten debtors that they will be jailed if they do not appear in court or at the jail with money in hand; to hold jail arrestees for days without appearing before a judge; and to set and subsequently modify monetary payments required to secure release arbitrarily and without any formal process.

14.     It is and has been the policy and practice of the City to confine impoverished people who cannot afford to pay their fines and/or bond in grotesque, dangerous, inhumane conditions.

15.     The Plaintiffs seek declaratory, injunctive, and compensatory relief.

**Jurisdiction and Venue**

16.      This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq.*, and the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

17.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because the Defendant resides here, and a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

**Parties**

18.      Plaintiff Thomas Baker is a 41-year-old man. Plaintiff Sean Bailey is a 37-year-old man. Plaintiff Nicole Bolden is a 34-year-old woman. Plaintiff Allison Nelson is a 24-year-old woman. Plaintiff Meredith Walker is a 47-year-old woman. All of the named Plaintiffs are residents of Saint Louis County, and the individual facts and circumstances giving rise to their claims are described below.

19.      Defendant City of Florissant is a municipal corporation organized under the laws of the State of Missouri. The Defendant operates the Florissant City Jail and the Florissant Municipal Court.

**Factual Background**

A.      **The Plaintiffs' Imprisonment**

   i.   **Thomas Baker**

20.      Thomas Baker is a 41-year-old African-American male, a former army reservist, a father of three children—ages eleven years, five years, and three months—and a resident of the City of Florissant.

21.     Mr. Baker estimates that he has been jailed approximately fifteen times in the City of Florissant in the past five years, each time for failure to pay fines on minor municipal ordinance violations and for failure-to-appear charges. Mr. Baker has been jailed for as long as three to four days following such arrests.[4] Each time Mr. Baker has been jailed by the City of Florissant, the city has assessed a "bond" between $600 and $1,200 to secure his release. Notably, many of the bonds and arrests arise from alleged minor traffic violations punishable by a fine of not more than $300 dollars and no term of imprisonment, even upon conviction.

22.     Mr. Baker has never been brought before a judge while in custody.

23.     Based on records produced by Florissant, Mr. Baker has been arrested, charged, assessed bonds and fines, and imprisoned multiple times based on minor traffic offenses, on at least the following occasions:

> a.  A warrant issued on September 12, 2012, for an alleged traffic violation for which Mr. Baker was charged with cutting through a parking lot to avoid an intersection, in violation of Florissant Municipal Code § 340.160, which carries a maximum penalty of a $300.00 fine, and for failure to appear at a court date related to it, assigning a $200.00 bond, plus $125.00 in fees and costs. On January 17, 2013, Mr. Baker was taken into custody by Florissant police at the police station in Creve Coeur, Missouri, on the September 12, 2012 warrant.
>
> b.  On September 5, 2013, Florissant issued an arrest warrant for Mr. Baker for operating a vehicle with a defective muffler in violation of Florissant Municipal Code § 380.140, which carries a maximum penalty of a $300.00 fine and no jail time, and for failure to appear at a related court date. The warrant carried a $700.00 bond, and noted four charges for failures to appear, and an outstanding debt to the city of $625.50.
>
> c.  Florissant police again arrested Mr. Baker on December 19, 2013, when he was stopped for allegedly speeding and driving without a seatbelt fastened.

---

[4] Counsel for Plaintiffs requested, in writing, that the City of Florissant provide information regarding the length of stay for each period of detention, pursuant to Missouri Sunshine Law, Mo. Rev. Stat. 610.100. In almost every case the City of Florissant neglected to provide information regarding either the period of detention, or the release dates of Plaintiffs.

Police arrested him on the September 5, 2013 warrant, and for warrants outstanding in Berkley, Missouri, and Ferguson, Missouri.

d.  On April 16, 2014, Florissant issued an arrest warrant for Mr. Baker based on the alleged speeding violation from December 19, 2013 and another failure to appear charge. That warrant carried a new $200.00 bond. On May 11, 2014, Florissant police took Mr. Baker into custody on the warrant. The narrative description of the arrest states Mr. Baker was held only on the failure to appear charge, and for charges in the Berkley and Ferguson jurisdictions. A new court date issued for September 3, 2014.

e.  On July 17, 2014, Florissant issued yet another arrest warrant for Mr. Baker for allegedly improper vehicle registration tags in violation of Florissant Municipal Code § 390.050, which carries a maximum penalty of a $300.00 fine and no jail time, and for two alleged failures to appear. The warrant carried a $400.00 bond. Florissant police arrested Mr. Baker on February 20, 2015 when he was pulled over for allegedly speeding and possessing improper vehicle registration. He was held for the speeding charge, the improper registration charge, and the *four* outstanding failure to appear warrants, issued by Florissant, St. Louis County, and the City of St. Louis.

24.     Following the above-referenced arrests, Florissant has repeatedly given Mr. Baker court dates which conflict with court dates in other jurisdictions and/or conflict with work shifts he is assigned at his job, often without sufficient notice to schedule time off. This has made it especially difficult for Mr. Baker to appear at his court dates in the Florissant Municipal Court, with a missed appearance carrying the threat of an additional $100 fine, a new failure to appear warrant, and a corresponding bond required to secure his release from confinement.

25.     Mr. Baker has never been given credit for time served in the Florissant City Jail, leaving him in a perpetual state of debt to the City of Florissant.

26.     In 2015, Mr. Baker lost his job at Specified Credit Association while he was in the City's custody. Mr. Baker told the jail staff that he needed to call in to work, but was not permitted to call. His car was repossessed because he had no income after losing his job and was forced to pay what money he had toward his fines in the City of Florissant to avoid further jailing. He was thus unable to make his car payments.

8

27.     During his stays in Florissant's jail, Mr. Baker was denied access to medical care by Florissant jail officers who would not permit him to access his medication for depression and anxiety. The officers at the jail told him that they did not believe he needed his medication or he would have carried it with him. Mr. Baker had no need to carry his medication with him because he takes it once nightly before bed. Mr. Baker's medications, Ativan, Desyrel, and Lexapro, cannot be stopped suddenly without harmful side effects.

28.     Mr. Baker experienced the disorienting effects of perpetual florescent light, which lit the Florissant jail 24 hours per day. With no clocks inside of, or visible from, the jail cells and no access to natural light, Mr. Baker sometimes had little sense of what time it was or how long he had been detained in the jail.

29.     The City of Florissant did not provide cups to its inmates. The only source of water was a spout connected to the toilet. The spout did not produce adequate water pressure to dispense water past the lip of the basin where the water is caught and drains. The toilets were not cleaned regularly. Thus, the only way to drink water was to press one's lips against the dirty toilet basin. Fearing for his health if he drank from such an unsanitary water source, Mr. Baker did not drink water at any time that he was held by the City of Florissant and was denied clean water entirely.

30.     Nearly every time that Mr. Baker was jailed by the City of Florissant, he witnessed overcrowded cells where three to four men or women were held in a two-person cell. On one occasion, Mr. Baker was housed in a two-man cell, with only two mats on two steel bunks. During that stay, four men were eventually stuffed into the small cell at the same time. No additional mats were provided for the additional men, and Mr. Baker was forced to sleep on the hard steel slab that he had claimed for himself, so that one of the men, sleeping on the ground

next to the toilet, could use a sleeping mat. On occasions when Mr. Baker was the third or fourth man, he stood throughout the night while the others slept.

31.     On one occasion, Mr. Baker was housed in a cell adjacent to a large man suffering from a Staph infection who had sores covering his body. The jail made no effort to cover the sores, and provided no treatment to the man. During that same stay, Mr. Baker observed another man enter another jail cell, who was visibly injured and bloody from some physical altercation. Mr. Baker was horrified to observe that the sleeping mats and blankets used by these inmates were not cleaned or disinfected but merely thrown into a pile where they contaminated other mats and blankets before they were used again.

32.     At no time did Florissant perform an inquiry into Mr. Baker's indigence or ability to pay.

### ii.   Sean Bailey

33.     Mr. Bailey is a 37-seven-year-old single father of one. He has experienced extended periods of homelessness since October 2014. He currently lives in St. Louis City.

34.     In February 2006, Mr. Bailey was pulled over, ticketed and arrested in Florissant for allegedly speeding and driving with a suspended driver's license.

35.     At his initial court date for the traffic violations, Mr. Bailey appeared in court, where the Florissant municipal judge announced that everyone was expected to make a payment against their traffic fines that evening, and that anyone who was unable to make a payment should prepare themselves to go to jail that evening. Mr. Bailey could not afford to make a payment, but secured his release by entering a guilty plea and agreeing to a payment plan even though he could not afford to keep up with it.

36.     When his next court date arrived, he did not have enough money to make the required payment. Fearing the Florissant Municipal Judge's threat of imprisonment if he was unable to pay, Mr. Bailey did not return to court. As a result, a warrant issued automatically for his arrest.

37.     Mr. Bailey estimates that he has been jailed five or six times by the City of Florissant based on warrants stemming from the original 2006 violations, sometimes for as long as 72 hours.

38.     In November 2012, the City of Florissant took Mr. Bailey into custody from the St. Louis City Justice Center. He had spent two months in the "Workhouse" (the St. Louis City Medium Security Institution) as a pre-trial detainee because he had been unable to pay a bond issued by St. Louis City until it was reduced to $100, which he borrowed money to pay.

39.     The temperature outside was twenty-eight degrees when Florissant took Mr. Bailey into custody. When he arrived at the Florissant jail, the air conditioner was running. Florissant jail officers gave Mr. Bailey an orange jumpsuit, a sheer blanket as thin as a golf shirt, and a dirty sleeping mat to take to his cell. The officers took his underpants and shoes. He and fellow inmates complained about the frigid temperatures, but the jailers told the inmates that the place would become a cesspool if they did not keep it cold. The jailers also stated that they wanted the jail to be uncomfortable so that inmates would not want be there and would be motivated to pay their bonds and fines.

40.     Mr. Bailey was given a $500 bond, which he was not able to pay. Florissant officers released him the following morning on a recognizance bond.

41.     Documents produced by Florissant show that Mr. Bailey has been arrested on failure to appear charges stemming from that same 2006 arrest on at least the following occasions:

       a.  On April 16, 2013, Florissant police arrested Mr. Bailey on a failure to appear charge stemming from the same traffic arrest issued seven years earlier in 2006, and on an outstanding warrant from the City of Ferguson. The Florissant warrant carried a $500 bond. At the time he was unemployed. Florissant police held him at the city jail for thirty-six hours, then transferred him to the custody of the Ferguson police department with a Florissant court date 120 days later on August 15, 2013.

       b.  On August 15, 2013, a warrant issued for Mr. Bailey's arrest for failure to appear. The warrant carried another $500 bond. On November 15, 2013, Florissant police executed the warrant and arrested Mr. Bailey on the failure to appear charge while he was in custody of the St. Louis City police department.

42.     Bonds requested of Mr. Bailey stemming from his 2006 traffic arrest ran as high as $1,000, and fines reached nearly $1,500, accruing from "Failure to Appear" Charges and warrant fees. During some stays in Florissant jail, his jailers and their Sergeants would attempt to negotiate with him to pay various amounts of bonds, decreasing the amounts requested the longer he was held, until he was finally released either after payment or on his own recognizance if he was unable to pay any amount. Mr. Bailey never saw or appeared before a judge while he was in custody.

43.     While Mr. Bailey was being held in the Florissant jail, drinking water came only from the top of the toilet, via a spout and reservoir that were generally covered with spit, blood, and urine, in their perch roughly one and a half feet from the toilet seat. Cups were never provided to detainees, and the water pressure was insufficient, requiring thirsty detainees suffering from the dry, air-conditioned air, to press their lips against the contaminated surface to

drink. The water temperature varied unpredictably from hot to cold, and always tasted and smelled rank. Mr. Bailey felt that the water was not fit to give to a dog.

44.     Mr. Bailey never saw Florissant jailers clean any cells. The only time he saw the jailers clean was when an inmate vomited in the hallway that guards regularly walked. Otherwise, the cells remained dirty.

45.     Used, dirty sleeping mats and blankets were stacked in a laundry cart, but were not cleaned between uses. They were visibly stained, smelled of other people's body odor, and were uniformly contaminated with sweat, puss, blood, vomit, and other bodily fluids of countless inmates, along with dirt and other contaminants.

46.     Phone use was severely limited in Florissant jail. Mr. Bailey observed that only one call could be made at booking. If no one answered, the inmate was "out of luck."  Otherwise, calls could be made within the jail only one at a time, and he and other inmates often went a day or more without being permitted to make any telephone calls, including to lawyers and family. Generally, only one collect call was permitted per detainee per stay, and then only to individuals in possession of a credit card who were willing to accept the charges and able to receive calls.

47.     Mr. Bailey observed that cells were overcrowded at the Florissant jail. Three-bed cells were often stuffed with a fourth detainee, who would then be forced to sleep on the floor.

48.     Mr. Bailey and other inmates were routinely denied access to their medications.

49.     All of Mr. Bailey's experiences with the Ferguson Municipal Court and Jail stem from his arrest by Florissant police for municipal traffic violations in February 2006, now more than ten and a half years ago.

50.     At no time did Florissant perform an inquiry into Mr. Bailey's indigence or ability to pay.

### iii. Nicole Bolden

51.     Nicole Bolden is a 34-year-old single mother of four children.

52.     Ms. Bolden was arrested in the City of Florissant on or about March 19, 2014 after she was involved in a traffic accident. Police arrived on the scene of the accident at approximately 8:30 a.m. Ms. Bolden had just dropped off two of her children at school and was driving with her two other children, a two-and-a-half-year-old daughter and a fourteen-month-old son. Ms. Bolden was not at fault, but a responding officer conducted a warrant check and discovered that Ms. Bolden had outstanding arrest warrants in three jurisdictions: the cities of Dellwood and Hazelwood in St. Louis County, and Foristell in St. Charles County. All of Ms. Bolden's warrants were for unpaid traffic tickets.

53.     The arresting Florissant officer instructed Ms. Bolden to contact someone to come pick up her children. Fortunately, Ms. Bolden was near her mother's house and able to reach her sister. Ms. Bolden was permitted to wait with her children while her sister took a taxi to the location of the accident. Once her sister arrived, the officer handcuffed Ms. Bolden and placed her in a police car in the presence of her children. The officer then transported her to the Florissant jail.

54.     After arriving at the Florissant jail, Ms. Bolden requested that she be taken to the hospital so that she could be examined for possible injuries suffered during the accident. The arresting officer refused, and instead offered Ms. Bolden pills that she stated were ibuprofen. Ms. Bolden was not sure that the pills contained ibuprofen and refused to take them. This angered the officer, who placed a warning by Ms. Bolden's name on the dry-erase inmate information board. The officer then told her that she would have to stay in jail until she could pay her bond.

55.     Ms. Bolden was assigned a $400 bond on traffic charges issued after Florissant officers responded to the accident. The charges were for driving with a suspended driver's license and driving a vehicle with expired registration, both Florissant Municipal Code violations.

56.     Ms. Bolden told the jail officers that she could not afford the bond and asked why she had a bond on charges for which she had not yet been assigned a court date. The guard did not answer her question except to state that Ms. Bolden would be released to Hazelwood sooner if she paid the bond.

57.     Florissant jailers placed Ms. Bolden in a cell with four other women. The cell and floors were dirty. One of her cellmates stated that she saw a roach, but Ms. Bolden closed her eyes and tried to sleep. The sleeping mats and blankets provided by the jailers were also dirty.

58.     The jail was cold, and without any natural light. Jail officers gave Ms. Bolden a short-sleeved jumpsuit to wear, and permitted her to keep her underwear. Ms. Bolden did not have socks, so she went barefoot throughout her stay.

59.     Because the jumpsuits were one piece, the women had to strip to their knees to use the toilet. They warned each other when they were using the toilet to give one another privacy. Those without bras exposed their breasts as they used their hands to keep their jumpsuits off of the floor and away from the toilet water. These predominantly black women hoped that the predominantly white and male guards did not watch them on the video surveillance cameras while they relieved themselves, but had no way to avoid it.

60.     One of Ms. Bolden's cellmates was going through withdrawal from a substance dependence, for which she received no treatment. Another was menstruating. That woman asked for sanitary supplies, but was not provided with tampons, pads, toilette paper, a shower, soap to

clean herself, or even a clean jumpsuit. Menstrual blood soaked through her jump suit and onto her sleeping mat and blanket. The only hygiene product available to her were tissues.

61.     In addition to the hygiene products listed above, Ms. Bolden and her fellow detainees were also denied access to toothbrushes, toothpaste, deodorant, and combs. They ate microwaveable pot pies for lunch and dinner and doughnuts for breakfast. Water was only available from a spout connected to the dirty toilets they shared, with insufficient water pressure to drink without pressing their lips against the toilet.

62.     At no point did any guards inquire about Ms. Bolden's ability to pay her bond. She was never taken before a judge.

63.     Ms. Bolden was held in Florissant for over 48 hours before she was taken into custody by the City of Hazelwood on March 21, 2014. From the City of Hazelwood she was taken into custody by St. Louis County on a warrant arising from a traffic ticket in the City of Dellwood. From St. Louis County, she was then transported to St. Charles County and held there on behalf of the City of Foristell, also for a warrant stemming from a traffic ticket. In total, she was jailed for 15 straight days solely due to her inability to pay fines for municipal court violations.

64.     Florissant arrested and jailed Ms. Bolden again on April 27, 2015. This arrest stemmed from a failure to appear warrant. Ms. Bolden was again assessed two $200 bonds that she could pay to secure her release. The conditions in the jail were substantially the same as during her incarceration in March, 2014. At this time, however, Ms. Bolden was in her third trimester of pregnancy, and her mother had recently died. Ms. Bolden received a small sum of money from her mother's life insurance policy. She used part of that money to pay her bond and go home.

65.     At no time did Florissant perform an inquiry into Ms. Bolden's indigence or ability to pay.

### iv. Allison Nelson

66.     Allison Nelson is a 24-year-old woman living in Jennings, Missouri.

67.     Ms. Nelson worked at a clothing store making near minimum wage from June 2012 to June 2014. She was recently hired by Sears, working on commission and making $4.63 per hour.

68.     Ms. Nelson has been jailed on two occasions by Florissant because she could not pay fines and costs from traffic tickets. On each occasion, Ms. Nelson was held in jail—even though she was indigent—because she could not afford a sum of money demanded by the City.

69.     On June 26, 2012, Florissant issued a warrant for Ms. Nelson's arrest for failure to appear, stemming from a citation for allegedly driving a vehicle with expired registration in violation of Florissant Municipal Code § 390.050. A violation of Section 390.050 is a "minor traffic violation," carrying a penalty of not more than a $300 fine and no jail time. The arrest warrant carried a $200 bond.

70.     On January 22, 2013, Florissant police took Ms. Nelson into custody from the Ferguson police department. Florissant officers released Ms. Nelson after her mother, who lives on a fixed income, paid her bond.

71.     In November 2013, Ms. Nelson was arrested in Chesterfield on a Florissant warrant for failure to make a monetary payment stemming from traffic tickets. She remained in Chesterfield for several hours awaiting pickup by Florissant. While she was in Chesterfield, her mother contacted the City of Florissant to see how much it would cost to bond her out. Florissant

officials told her that it would cost $700 to bond Ms. Nelson out, but that the bond would be reduced once Ms. Nelson could be picked up by Florissant and booked.

72.    Florissant police collected Ms. Nelson sometime after midnight and took her to the Florissant City Jail. At some point thereafter, Ms. Nelson's bond was reduced to $300. Ms. Nelson's mother still could not afford to bond her out. Ms. Nelson remained in jail for approximately two days until her mother was able to borrow the bond money on her behalf.

73.    During this period in the Florissant jail, Ms. Nelson was housed with a sick, coughing older woman and a pregnant heroin addict who was experiencing severe symptoms of withdrawal, foaming at the mouth and urinating on herself and on the floor. The guards did nothing to clean up the woman or the mess, other than to push the urine around on the floor with a wet mop and release the woman from jail.

74.     Even after Ms. Nelson's mother was able to secure enough money to bond her out of the Florissant jail, Ms. Nelson was taken to the Jennings jail. There, jail staff told Ms. Nelson that she would not be released unless she paid approximately $1,000. She informed the jail staff that she could not afford to pay. After four days, the jail staff informed her that her release amount would be lowered to $100. Her parents came to the jail and paid $100, and she was released immediately in the early morning hours of Thanksgiving Day. Ms. Nelson was then transported to the Ferguson jail. Ferguson jail staff told her that she would be held indefinitely and miss Thanksgiving with her family unless she paid several hundred dollars. That same morning, after shift change, a new guard arrived and told her that, since it was Thanksgiving, he would agree to let her out if she could find someone to pay $100. Ms. Nelson's family borrowed money and came as fast as they could to Ferguson in order to bring her home for Thanksgiving.

75.     While in the Florissant jail, Ms. Nelson was surrounded by other women who were there because they could not afford to pay the amount that Florissant required for their release.

76.     Ms. Nelson endured materially the same deplorable jail conditions as the other Plaintiffs. She was kept in a cell and denied access to a toothbrush, toothpaste, and soap. The walls were moldy and covered in gum, paint chips, blood, mucus, and feces.

77.     The jail did not provide clean mats, and also passed dirty blankets from previous inmates to new inmates without cleaning them.

78.     If the inmates wanted water, she and the other women were forced to drink warm water from a mechanism above the toilet, which smelled like a sewer. The water pressure was insufficient so that the water did not break contact with the toilet. Ms. Nelson was unable to drink water under such conditions and went without water each time she was held in Florissant.

79.     Ms. Nelson and other inmates ate only a honey bun or a doughnut in the morning and a microwaveable pot pie for lunch and dinner.

80.     The threat of jail and cycle of increasing debts to the City of Florissant has been a constant fact of daily life for Ms. Nelson for several years, causing her fear of leaving her own home or even getting into a car as a passenger.

81.     Ms. Nelson's dream for years has been to join the Navy. After she passed the relevant tests as a teenager, a Navy recruiter told her that she could not join until she fixed all of her unpaid traffic warrants and tickets. She was never able to afford to do so.

82.     In addition to being jailed by Florissant, Ms. Nelson has also suffered through arrests and jailings by the City of Chesterfield, the City of Ferguson, the City of Jennings, the City of Pagedale, the City of Country Club Hills, and the City of Bellefontaine Neighbors. In

every instance, she has been jailed simply because she could not afford to pay fines, fees and/or bonds related to traffic tickets.

83.     At no time did Florissant perform an inquiry into Ms. Nelson's indigence or ability to pay.

### v.   Meredith Walker

84.     Meredith Walker is a 47-year-old mother of two in Florissant, Missouri.

85.     In the past five years, Ms. Walker has been jailed on at least ten occasions by municipalities in the St. Louis region for unpaid fines from traffic tickets and other minor municipal violations. She has paid over $15,000 in fees, court costs, and bond forfeitures, rendering her unable to provide for herself and her children. She has lost her driver's license— and in turn her ability to seek and retain employment—because of her inability to pay the fines.

86.     Ms. Walker's traffic citations from the City of Florissant continue to plague her to this day, even though she has not been cited for a moving violation in over fifteen years.

87.     In the past five years, Ms. Walker has been jailed in Florissant two or three times in addition to being jailed in St. Ann (on behalf of Normandy and Velda City), Bel Nor, Moline Acres, Ferguson, St. Louis County, St. Louis City, and Pine Lawn. At one point, Ms. Walker had outstanding warrants for her arrest in eleven different St. Louis area municipalities, all of which stemmed from unpaid traffic tickets and charges for "Failure to Pay" or "Failure to Appear" in connection with those alleged traffic infractions.

88.     On almost all of these occasions, Ms. Walker experienced the so-called "muni-shuffle": she was transferred from one municipal jail to another, paying bonds at each to secure her "release" to the next, or, if she could not afford to pay bond, remaining in jail until jail

officials (or the municipality on whose behalf she was held) decided to release her into the hands of the next set of jailers.

89.     Ms. Walker has appeared in Florissant's municipal court on multiple occasions. Not once has a Florissant municipal court judge informed her of her right to an attorney, afforded her an attorney, or proposed alternatives to payment of a fine (such as community service).

90.     Ms. Walker has tried to pay off her debts, but simply cannot afford to do so. It is well known in Ms. Walker's community and among her friends and family that showing up at court without full payment will lead to incarceration. As a result, Ms. Walker has on many occasions feared that appearing in court without the money to pay a fine would immediately land her in jail.

91.     Ms. Walker has been unsuccessfully trying to pay off approximately $3,000 of fines to the City of Florissant over the past four years.

92.     Ms. Walker's inability to extricate herself from this cycle of debt and jailing imposed by the City has virtually destroyed her life.

93.     Ms. Walker does not have a valid driver's license because she cannot afford to pay off all of her fines, costs, surcharges, and interest. She is forced to rely on family and friends to drive her to the store or to her son's basketball games, placing strain on cherished relationships. Ms. Walker is unemployed and has been unable to find a new job in large part because of her traffic record and because she does not have a valid license. Many of the positions for which she is otherwise qualified require a valid driver's license to transport clients.

94.     Ms. Walker has been forced to change her appearance because she discovered that she was stopped by police officers more often when she had dreadlocks in her hair and appeared more masculine.

95.     Ms. Walker has spent many holidays in jail for unpaid traffic tickets, missing time with family and friends.

96.     Ms. Walker is unable to travel around the St. Louis area, in part because bus service in North County (where she lives) is unreliable, and in part because she is now terrified of the police.

97.     Ms. Walker has had a trying experience when she has attempted to address charges which have been unfairly brought against her. When she has contested these new charges both the Municipal Court Clerk and Judge have threatened to renege on prior agreements to reduce her fines if she continued to contest the fines added on.

98.     When Ms. Walker has been unable to make payments to the City of Florissant, additional fines have been assessed against her, even when she has appeared in court.

99.     Most recently, on March 26, 2016, Ms. Walker appeared in the Florissant Municipal Court and stated that she could not make a payment because she was unable to work and earn income while recovering from a torn ACL. The court only gave Ms. Walker a one-month continuance even though she would be unable to work for ten weeks. When she appeared in court on April 21, 2016, still unable to make a payment, the court assessed additional fines against Ms. Walker.

100.    On one occasion, Florissant jailed Ms. Walker overnight and would not permit her to call in to work, resulting in disciplinary action at her job.

101.    At no time did Florissant perform an inquiry into Ms. Walker's indigence or ability to pay.

**B.      The City's Policies and Practices**

102.    The City of Florissant is the largest municipality in St. Louis County and the twelfth largest city in Missouri, with 52,000 residents. Approximately 8% of the City's residents live in poverty according to the United States Census Bureau.

103.    The City of Florissant issued 28,436 arrest warrants in 2015, more than three times the average of 8,842 from 2011 to 2014. More than 20,000 of these warrants were for traffic citations—averaging more than one warrant issued for every 1.8 residents. Even with this increase in warrants, there was a 33% *decrease* from 2014 to 2015 in total new traffic cases filed in Florissant Municipal Court. New traffic cases remained relatively constant between 2011 and 2014, with an average of 28,799 new traffic cases filed each year.

104.    The vast numbers of warrants and fines issued by the City also make up a substantial portion of the City's revenue. In 2015, the City collected more than $2,300,000 in court fines and fees and forfeited bond payments, down from more than $2,500,000 in 2014, $2,670,000 in 2013, $2,620,000 in 2012, and $3,100,000 in 2011. The cost to operate the City's Municipal Court, by contrast, was budgeted at roughly $700,000 per year between 2011 and 2015. The City thus netted as much as $2,200,000 in 2011 and still netted $1,600,000 even in its least profitable year. The City's only sources of greater revenue are sales and utility taxes.

105.    It is the policy and practice of the City of Florissant to use its municipal court and its jail as significant sources of revenue generation for the City. The City of Florissant projects the amount of revenue to be raised through ticketing and fines during its budgeting process.[5] As a result, the entire municipal government apparatus, including municipal court officials and City

---

[5] The City uses the money collected through these procedures to help fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

jailors, has a significant and corrupting incentive to operate the court and the jail in a way that maximizes revenues, not justice.

106. Over the past five years, the City of Florissant has, according to its public records, earned more than $12,000,000 from its municipal court fines, fees, costs, and surcharges. A proportional per capita budgetary revenue stream from municipal court fees for the entire Saint Louis metropolitan region would be more than $644,000,000

107. The impact of the City's ticketing and warrant-issuance practices falls disproportionately on black residents and black motorists. Black drivers have been significantly more likely to be stopped, searched, and arrested than white drivers, even though whites are more likely to possess illegal contraband when searched. Although whites make up more than 71% of Florissant's population, they constituted only just over a quarter of vehicle stops in 2014. Conversely, while black residents are only 26.8% of the City's population, *71.2%* of vehicle stops conducted in Florissant in 2014 involved a black motorist. The same financial pressures and corrupting influences thus infect City police decisions, including decisions about conducting traffic stops, issuing tickets, and making arrests.

108. The treatment Plaintiffs received was caused by, and is representative of, the City's policies and practices concerning collecting unpaid fines, fees, costs, and surcharges arising from traffic tickets and other minor offenses over at least the past five years.

109. Decisions regarding the operation of the court and the jail—including but not limited to the assessment of fines, fees, costs,[6] and surcharges; the availability and conditions of payment plans; the setting and re-setting of amounts required for release from jail; the issuance and withdrawal of arrest warrants; and the non-appointment of an attorney—are significantly

---

[6] Missouri Law requires costs to be waived for the indigent, *see* Mo. Code § 479.260, but the City ignores that law.

influenced by and based on maximizing revenues collected rather than on legitimate penological considerations.

### i. Arbitrary and Indefinite Detention of the Indigent

110.    As each of the Plaintiffs' cases illustrates, the City of Florissant has adopted a policy and practice of arresting people when they owe unpaid debt from old and even new traffic tickets and other minor offenses. When those arrestees are booked at the Florissant jail, they are told by jail staff that they can be released immediately, but only if they pay cash to the City of Florissant. If they cannot pay the City, they are told that they will be held indefinitely.[7]

111.    The amount of cash that Florissant requires for release is based on the debt owed by the person from their old traffic or other misdemeanor cases.

112.    It is and has been the policy and practice of the City of Florissant to hold people in jail unless and until they or their families pay the City—regardless of indigence.

113.    It is and has been the policy and practice of the City of Florissant to gradually and incrementally reduce the amount of money required to buy a person's release. The reason for this policy is to generate as much money as possible. Some people's families are able to borrow and

---

[7] The City's policies and practices—and the terminology that it uses—are at times difficult to navigate. For example, many of the monetary debts that the City claims are owed are actually additional fees and surcharges automatically assessed for the issuance of warrants or the recalling of warrants. These are "assessed" and declared owed entirely independent of any conviction and without any finding of guilt. Moreover, many of the release amounts (which City employees call "bond" amounts) are purportedly classified as pretrial money bail for new charges, typically the charge of "failure to appear." Each of the named Plaintiffs was, according to the City, kept in its jail pursuant to cash "bond" relating to new "failure to appear" charges. In any event, the City applies materially the same money-based post-arrest detention policies to arrestees charged with new offenses as it does to arrestees who owe old debts. All are kept in jail indefinitely unless and until they make arbitrary monetary payments or unless and until City employees negotiate lower release amounts or ultimately decide to release them for free. None are held pending any court appearance. Thus, those arrested for new ordinance violations and those arrested for non-payment (which is typically accomplished through a new charge) are all treated the same and are all subjected to the same post-arrest money-based policies and practices.

raise significant money up front to buy the release of their loved one within hours or days. The longer a person stays in the Florissant jail, however, the more it costs the City and the clearer it is that the person's family cannot raise enough money. Thus, the City's policy and practice is to lower the amount periodically on the assumption that the person can raise at least some money to buy his or her release.

114.   As a matter of policy and practice, City jail staff and supervisors, including Sergeants of the police department, attempt to negotiate or bargain with the person or the person's family concerning the amount of money that they are able to pay. This bargaining takes place both inside the jail with the inmate and over the phone or in person at the clerk's office with the inmate's family.

115.   In many cases, after significant jail time, the City will release the person for free if it is clear that the City cannot extract any money from the person during that jail stay.

116.   Upon information and belief, inmates find out about these incremental reductions by asking jail staff every morning what their new required payment is. Some days they are told that it has remained the same, and other days they are told that it has been reduced. Inmates are then usually given an opportunity to use the telephone to call family or friends who might be able to come up with enough money to pay for their release. The reductions do not happen as the result of any formal adversarial process.

117.   The City's incremental reductions of the amount required for release are designed also to punish debtors for non-payment on the theory that time in jail will encourage impoverished people to pay in the future if they know that they will be jailed for non-payment. These threats result in people and families borrowing money at high rates of interest to release a loved one or taking money otherwise needed for food, diapers, rent, clothing, and utilities and

giving it to the City of Florissant instead. The result has been widespread hardship for the impoverished people of Florissant and the surrounding area, whose local governments have decided to make families choose between feeding hungry children and letting a loved one languish in jail.

118.   These policies and practices have created a culture of fear among the City's poorest residents, who are afraid even to go to the City police department or the City court to explain their indigence because they know they will be jailed by the City without any meaningful process. The same fear motivates many very poor City residents to sacrifice food, clothing, utilities, sanitary home repairs, and other basic necessities of life in order to scrape together money to pay traffic debts to the City.

119.   From the perspective of City officials, these coercive threats are successful. They are successful because the threats and jailings have been crucial to pressuring family members— who have no legal obligation to pay any money to the City on behalf of indigent relatives or friends who owe money from old civil judgments—to come up with money in order to get their loved ones released from jail. They have also been crucial in getting low-income people to forgo basic necessities of life in order to pay the City in an attempt to avoid jail. It is only through this illegal confinement and threat of confinement that the City is able to collect that additional money that any normal creditor could not.

120.   The basic scheme of the City of Florissant is to extort—through the threat of physical confinement—money from debtors who are otherwise unable to afford to pay both the basic necessities of life and their debts to the City. The City's policies and practices have resulted in the community knowing, and fearing, that impoverished debtors will be arrested and held by the City for days or weeks unless and until they pay enough cash to the City.

27

121.     When providing information to inmates, the City refers to the amount of cash required for release as the inmate's "bond," even though the amount is set by reference to the amount of outstanding debt. Moreover, the money is applied automatically toward old unpaid debts and is set, reset, and modified without any judicial process and without making any of the lawful considerations required by Missouri's statutory bail system and the United States Constitution.[8] Nor is the "bond" amount set in relation to any particular pending charge for which legal proceedings are imminent. Indeed, inmates are held indefinitely without being brought before a judge. If a person subsequently misses any future payment after being released, the City, without any legal process, confiscates previous amounts paid by the person to secure their release from jail, and resets the person's debts. The City also adds a "warrant" fee[9] for the person's missed payment without any legal process.[10] Trapped by this cycle of recurring debt, arrest, payment, and new debt many impoverished people pay thousands of dollars to the City

---

[8] In the case of new warrantless arrests who owe no debts from prior cases, the City uses these release amounts to ensure collection of future not-yet-imposed money judgments from people who will likely be too poor to pay those judgments after conviction absent the threat of jail. Because it releases people for free after indeterminate periods of time but routinely prior to any court date, the City uses these "cash bond" amounts to ensure that it collects money for ultimate violations in advance rather than for any legitimate pretrial government objective. The City uses a cash "bail schedule" based on the charge of arrest as determined by City police as the starting point for police and jail officials to negotiate and lower with arrestees and their families the longer a person remains in jail after an arrest.

[9] From 2009 through 2016, Defendant City of Florissant raised more than $1,800,000 by charging illegal "warrant cancellation" fees, requiring individuals to pay money not only to have their warrants recalled, but to be given a court date to appear in court and the chance to contest the underlying charges, as well. In addition to violating state law due to profit generating purpose, "warrant cancellation" fees violate due process, insofar as they require that a person pay an illegal fee in order to obtain access to the courts and hopefully to justice. They also violate equal protection insofar as such fees deny access to the courts on the basis of an individual's inability to pay a fee.

[10] For example, the person is not arraigned on any new charge for failure to appear prior to the "warrant cancellation" fee being assessed against them, and the person is not given a meaningful opportunity to present a defense to the elements of a failure to appear charge. The fee is simply added to the person's debts. *See Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).

over a period of many years, arising solely from a small number of relatively inexpensive initial traffic citations.

122.    At any time, a person indebted to the city can end this cycle by paying the balance of her debt. It is and has been the policy and practice of the City of Florissant to allow any inmate at any time to pay the full amount of the debt owed and to be released immediately, terminating all existing previously assessed "cases" for which debt is still being collected.[11]

123.    Similarly, at any time, either before or after an arrest, the policy and practice of the City of Florissant is to allow all arrest warrants to be recalled if they pay the entire amount of their outstanding balance with the City. It is also the policy and practice of the City to allow individual warrants to be removed without eliminating the entire debt, if the person also pays an amount arbitrarily set by City employees—usually several hundred dollars in cash based on the arrestee's total unpaid balance.

124.    The City employs a materially different set of procedures for those arrestees and debtors who retain private defense counsel. It is and has been the policy and practice of the City of Florissant to immediately remove existing arrest warrants and schedule new court dates when an attorney makes an appearance on behalf of a debtor or arrestee. However, if the individual is in custody, they must pay their bond to secure their release. Furthermore, if the individual has already pled guilty, and has had a warrant issued for failure to make a payment or appear in court, Florissant's court clerks will often decline to permit an attorney to appear on the case and will not recall the warrant. It is the City's policy and practice, however, to tell unrepresented debtors and arrestees that there is no way to clear their warrants unless they pay their "bond" to the City.

---

[11] The "cases" for which the City is collecting debts have, for the most part, been closed for years, with civil judgments entered requiring the payment of fines and costs.

125.    It is and has been the policy and practice of the City of Florissant to keep some debtors in jail for indefinite periods without bringing them to court. The City has often kept inmates unable to make monetary payments in its jail without bringing them to court for days or weeks.[12]

### ii.   Debt-Collection Proceedings in the Florissant Municipal Court

126.    It is and has been the policy and practice of the City of Florissant to conduct court sessions approximately six to seven times per month, for a variety of different dockets, including traffic docket, trial docket, housing docket, and attorney docket. Traffic specific dockets are usually held twice per month in the evening. Inmates brought to the court from the jail (of which there are few) are told that they will remain in jail unless they make monetary payments, even though it is the policy and practice of the City of Florissant not to provide them with an attorney and not to conduct any meaningful inquiry into their ability to pay, as required by the United States Constitution.[13]

127.    Inmates are not advised of their relevant rights under federal or Missouri law, including applicable constitutional rights and state-law defenses and procedures.

128.    Those appearing in court from jail are told that they must pay a certain amount of money or be kept in jail. They are, as a matter of policy and practice, told to make phone calls to family members in an attempt to get family members to pay their debts.

129.    Non-incarcerated people are provided future dates to appear before the court. People are told, as a matter of City policy and practice, that failure to bring money to pay old debts will result in their arrest.

---

[12] The City also follows a policy and practice of holding inmates in jail for days on behalf of other municipalities until the other municipality decides whether it will pick them up or not.

[13] Because no inquiry is made into ability to pay, no inquiry is likewise made into the reasons for non-payment or alternatives to incarceration.

130.    As with confined inmates, a non-incarcerated debtor can end this debt collection process at any time by paying what she owes to the City in full. If that debtor is too poor to end this process, her closed "case" can go on for years and years in perpetuity after a civil judgment assessing financial penalties, with the City imposing additional fees and surcharges for missed debt-collection payments.[14]

131.    The City prosecutor and City judge do not conduct indigence or ability-to-pay hearings. Prior to this year, regular observers of the City court had never once seen an indigence or ability to pay hearing conducted in the preceding five years.

132.    The City prosecutor and City judge conduct no meaningful individualized process prior to ordering people to make particular monthly payments. Payment plans are set entirely without any adversarial process and without any individualized inquiry into the circumstances of a debtor. City jail officials ordering payments upon release from jail similarly follow no formal adversarial process in determining the amount of required payments. Those jailed for unpaid debts from tickets and other offenses (*e.g.,* for not making their ordered payments) are not appointed an attorney, even though the City is represented by an experienced prosecutor.

133.    In addition to the difficulty of mounting constitutional and statutory arguments and defenses in the face of an experienced prosecutor, navigating the origin of the numerous fees and surcharges imposed by Florissant and determining whether they are even validly assessed by the City in any particular case is a complicated inquiry. This inquiry involves the application of

---

[14] It is the policy and practice of the City of Florissant to inform debtors that, if they or their families pay their debt in full, they can be released from jail and have all proceedings terminated at any moment. At any time, the entire process can be ended by a monetary payment. If a person can afford to pay, the person will never have another court date set by the City of Florissant. The termination of these cases is determined solely by the wealth of individuals.

state law and procedure; local law and practice; multiple court files, accounting documents, and receipts over a period of years; and constitutional law to a person's lengthy case history.

134.     The vast majority of those jailed for violating a payment plan condition imposed by the City court were not represented by an attorney at any time on the underlying traffic or minor charge, because of the City's policy and practice not to appoint counsel for the indigent.

135.     The Plaintiffs and many other witnesses have observed numerous impoverished people jailed by the City for non-payment of debts without a meaningful inquiry into their ability to pay, without the representation of counsel, and without the City taking any consideration of whether imprisonment serves legitimate state interests in light of available alternatives, as required by federal and Missouri law. The Plaintiffs and other witnesses have observed numerous people and families who have been told that either they themselves or members of their family would be held in jail by the City unless and until one of them could produce large sums of money to pay off debts supposedly owed for traffic citations and subsequent surcharges.

### iii.   The Deplorable Conditions in the Florissant Jail

136.     As described above, inmates jailed for non-payment have, as a matter of City policy and practice, been kept in overcrowded cells with inmates strewn about the floors. The City has deliberately and callously ignored basic principles of hygiene, sanitation, medical and mental health care, and inmate safety.

137.     Inmates are denied toothbrushes, toothpaste, deodorant, and soap; they are kept in cells that reek of visible excrement and surrounded by walls smeared with blood and mucus; they are forced out of their own clothes and ordered to wear the same stained and dirty orange jumpsuits for days and weeks without access to clean laundry or clean undergarments; women are deprived of their bras, and forced to expose their breasts in order to use the toilet; all inmates

are deprived of socks and shoes; they huddle in cold temperatures with a single thin blanket even as they beg guards for warm blankets; their illnesses and infections, and open wounds and sores go uncovered and untreated, and disease, infection, puss, and blood cover mats and blankets which pass from inmate to inmate without being cleaned; they sleep next to an open uncleansed toilet; they endure days without being allowed to shower; women are not given hygiene products for menstruation; they are routinely denied vital medical care and prescription medication; inmates with serious mental health issues are not provided mental health treatment or prescription medication that they need; they are provided food so insufficient and uniform that inmates lose significant amounts of weight and lack essential nutrients; they suffer from dehydration because the City does not provide cups to its inmates and the only source of water is a spout connected to the toilet. The spout does not produce adequate water pressure to dispense water past the lip of the basin where the water is caught and drains. The toilets are not cleaned with any apparent regularity. Thus, the only way for one to drink water is to press one's lips against the dirty toilet basin, which many inmates are unwilling to do; they are deprived of books, legal materials, exercise, or internet; and they do not know when they will be allowed to leave their disorienting and timeless cage, deprived of windows and perpetually flooded in florescent light.

138. These abuses and deprivations are accompanied by other pervasive humiliations. Jail guards primarily ignore inmates but also taunt impoverished people when they are unable to pay for their release, telling them that all they have to do in order to be released is to pay money that they do not have.

139. The totality of these conditions described by the Plaintiffs and by numerous witnesses amounts to unlawful punishment. The conditions at the Florissant jail are deliberately

33

designed to be as degrading and humiliating as possible in order to punish debtors for not paying their debts and to discourage them from missing payments to the City. The purpose and effect is to coerce debtors to borrow money or use money otherwise needed for the basic necessities of life in order to pay the City to avoid being subjected to the dangerous and humiliating Florissant jail.

140.    The jail conditions created and perpetuated by the City of Florissant would be unconstitutional under the Eighth Amendment if individuals convicted and sentenced to prison were treated with such callous disregard for basic health and safety. The City forces these conditions on pretrial detainees and post-judgment debtors jailed long after monetary judgments and solely because of their inability to make monetary payments and not pursuant to any criminal sentence.

141.    It is the City's policy and practice to use its jail and the deplorable conditions there in discrete spurts of indefinite confinement to extract money from arrestees through arbitrary and incrementally decreasing "bond" debts until they finally prove unable to pay.

### iv.  The City's Flawed and Unlawful Warrant Process

142.    It is and has been the policy and practice of the City to issue invalid arrest warrants and to apply arbitrary and illegal policies for the issuance and recalling of warrants.

143.    Among the policies and practices of the City of Florissant are the following:

   a.  The City informs people that they can remove outstanding warrants simply by paying a sum of money but does not offer a way for the indigent to remove arrest warrants.[15]

   b.  The City allows for the removal of existing warrants without paying the City only if the person retains a lawyer.

---

[15] *See Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).

c.  The City issues arrest warrants for the failure to make a payment without probable cause to believe that the person had the ability to make a payment.

d.  When impoverished people appear in the courtroom and City payment window, they are told by the judge, courtroom officers, City prosecutor, City clerk, and City judge without a finding of ability to pay that they will be jailed if they do not bring specific sums of money to the City on designated dates in the future.

e.  The City issues arrest warrants for "failure to appear" when people do not pay by certain designated dates even though the person did not fail to appear at any court appearance.

f.  The City issues arrest warrants for "failure to appear" at court dates for which the person had not been given adequate notice. For example, for a hearing to which the person had not been validly summoned or to a hearing whose date the City has moved without ensuring actual notice has been given to the person. The City does not adequately ensure actual notice of changes in court dates and routinely issues arrest warrants even when it has no probable cause to believe that the elements of a "failure to appear" charge have been met, such as that the person did not intentionally fail to appear because the person was in the custody of another jurisdiction or was in the hospital.

g.  After arrest pursuant to a warrant, the City either does not bring the person to court at all or delays presentment unnecessarily and for no legitimate purpose for days or weeks.

h.  In cases of warrantless arrest, the City routinely fails as a matter of policy and practice to make a neutral finding of probable cause and thus holds people in jail for longer than 48 hours without a neutral finding of probable cause based on sworn evidence. Moreover, because the City's policy is to negotiate cash bond and then to release people for free eventually, it does not detain new arrestees for the purpose of any kind of court proceeding. Thus, the City's initial detention period based on warrantless arrest is unrelated to any legitimate government interest and entirely unconnected from any need to prepare for any probable cause or preliminary hearing because the City does not hold probable cause hearings or preliminary hearings or make any formal probable cause findings.

## C.  The Cycle of Debt and Jailing in Other Municipalities

144.  Like the other impoverished people stuck in this broken system, the Plaintiffs have been overwhelmed by the combination of multiplying fines, fees, costs, and surcharges from many different municipalities at once, as well as the cycle of repeated jailings and subsequent transfers to several different jails during each jailing, lost jobs, increased fees, and

35

the inability to renew driver's licenses because of unpaid tickets. After scraping together cash from family and friends and borrowing money to pay Florissant, the Plaintiffs and other Class members would simply be jailed by another city.

145.    The hopelessness of trying to navigate this system for years without financial resources and without the assistance of a lawyer who understands the process—never knowing when they left the house if they would be arrested and always confronted with the powerlessness of being kept in jail indefinitely because of their poverty—fundamentally altered the lives of the Plaintiffs and continues to tear at the core of the community.

146.    The fear of having basic rights violated with no recourse is a daily fact of life for the Plaintiffs and thousands of others. It is this despair that the Saint Louis County debtors' prison network cultivates that leads many impoverished people to avoid the system and some, sadly, to take their own lives while languishing in a jail cell.[16]

## Class Action Allegations

147.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

148.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the City's unlawful debt-collection scheme.

149.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)–(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

150.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

---

[16] At least four suicides and suicide attempts by people held because they were too poor to pay for their release have occurred in local municipal jails just in the past year.

151.    Plaintiffs propose three Classes: two Declaratory and Injunctive Classes, and two Damages Classes.

       a.   The first Declaratory and Injunctive Class is defined as: All persons who currently owe or who will incur debts to the City of Florissant from fines, fees (excluding "warrant recall fees", "letter fees", and/or "failure to appear fees", as defined in *Watkins v. City of Florissant*, No. 16SL-CC00165 (St. Louis Co. Cir. Ct. filed Jan. 2016)), costs, or surcharges arising from cases prosecuted by the City of Florissant.

       b.   The second Declaratory and Injunctive Class is all persons who, either because they owe debts to the City of Florissant or for any other reason, will become in the custody of the City of Florissant and thereby subjected to its post-arrest wealth-based detention procedures.

       c.   The first Damages Class is defined as: All persons, whether or not such person has ever been jailed, who have paid any amount to the City of Florissant to satisfy fines, fees (excluding "warrant recall fees", "letter fees", and/or "failure to appear fees", as defined in *Watkins v. City of Florissant*, No. 16SL-CC00165 (St. Louis Co. Cir. Ct. filed Jan. 2016)), costs, or surcharges arising from cases in the City court and who have not been provided an opportunity to prove indigence (the "Paid Fines Class").

       d.   The second Damages Class is defined as: All persons who have been jailed by the City of Florissant for non-payment fines, fees (excluding "warrant recall fees", "letter fees", and/or "failure to appear fees", as defined in *Watkins v. City of Florissant*, No. 16SL-CC00165 (St. Louis Co. Cir. Ct. filed Jan. 2016)), costs, or surcharges arising from cases in the City court and who (1) were not provided an opportunity to prove indigence prior to jailing; (2) were not considered a danger to the community by notation in the City's file; and (3) were not designated as a flight risk at the time of jailing (the "Jailed Class").

**A.**    **Numerosity: Fed. R. Civ. P. 23(a)(1)**

152.    Over the past five years, thousands of people have owed and currently owe the City of Florissant money from old traffic tickets and other minor municipal offenses. Pursuant to City policy and practice, thousands of people who have indicated that they are too poor to pay their debts in full have been placed on payment plans by the City. All of these people are currently being threatened with arrest and jailing pursuant to the City's illegal post-arrest money-

based detention policies if they do not make the payments in the amount or frequency purportedly required by the City. Pursuant to City policy, thousands of additional arrestees have been and will be charged by the City with new ordinance violations and kept in jail pursuant to the City's illegal post-arrest money-based detention policies.

153.    The City has kept hundreds of people in its jail for non-payment of cash "bond" in each of the past five years. The City retains, and is required by law to retain, records of these instances.

154.    The City followed and follows materially the same post-arrest procedures and debt-collection policies, practices, and procedures to accomplish the jailing of the Class members. For example, pursuant to the City's policy and practice, those kept in jail by the City when they could not pay did not receive meaningful inquiries into their ability to pay as required by federal and Missouri law. Pursuant to City policy, no determinations of indigence or evaluations of alternatives to incarceration were made, and the City provided none of the relevant state and federal protections for debtors. Nor were those jailed by the City provided adequate counsel to represent them.

155.    Those who still owe the City debt payments or who will incur such debts or be arrested for new charges will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**B.      Commonality: Fed. R. Civ. P. 23(a)(2).**

156.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class. The Plaintiffs seek relief concerning whether the City's policies, practices, and procedures violated their rights and relief mandating the City to

change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

157.    Among the most important, but not the only, common questions of fact are:

- Whether the City has a policy and practice of placing and keeping people in its jail who owe money on old judgments unless and until they can pay a monetary sum;

- Whether the City has a policy and practice of keeping people in its jail after arrest unless and until they can pay a monetary sum;

- Whether the City has a policy and practice of incrementally lowering the amount required to buy a person's release from custody as the person sits in jail;

- Whether the initial amount of money required by the City for release is predetermined and set by a fixed bail schedule without reference to a person's ability to pay;

- Whether the City has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before keeping the person in jail for non-payment;

- Whether the City provides notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether the City makes findings concerning ability to pay and alternatives to incarceration;

- Whether the City provides adequate legal representation to those jailed for non-payment in proceedings that result in their incarceration;

- Whether the City jail conditions are and have been unsanitary, unsafe, and inhumane in the ways described in this Complaint;

- Whether City employees and agents have a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;

- Whether the City has a policy of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt;

- Whether the City has a policy and practice of failing to make neutral probable cause findings based on sworn evidence for warrantless

arrests.

27.     Among the most important common question of law are:

- Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;

- Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by the City for non-payment;

- Whether people who cannot afford to pay the City are entitled to the consideration of alternatives to incarceration before being jailed for non-payment;

- Whether it is lawful for the City to keep arrestees in jail after arrest pursuant to a predetermined fixed cash bail schedule that does not take into account ability to pay before releasing arrestees after indeterminate periods of detention;

- Whether people are entitled to the appointment of and representation by a lawyer in proceedings initiated and litigated by City prosecutors that result in their incarceration if they cannot afford an attorney;

- Whether the City can employ jail, threats of jail, onerous generic "payment dockets," and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay the monetary judgment to the City in full;

- Whether the City can arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt;

- Whether and how long the City can lawfully hold people in custody on warrantless arrests without any neutral finding of probable cause and without any intention of bringing the arrested person before a neutral judicial officer for such a finding;

- Whether the jail conditions described in this Complaint violate federal law.

158.     These common legal and factual questions arise from one central scheme and set of policies and practices: the City's enormously profitable traffic- and ordinance-related post-

arrest detention and debt-collection system. The City operates this scheme openly and in materially the same manner every day, and all of the ancillary factual questions about how that scheme operates are common to all members of the Class, as well as the resulting legal questions about whether that scheme is unlawful. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

**C.      Typicality: Fed. R. Civ. P. 23(a)(3).**

159.    The named Plaintiffs' claims are typical of the claims of the members of the Classes, and they have the same interests as all other members of the Classes that they represent. Each of them suffered injuries from the failure of the City to comply with the basic constitutional provisions detailed below. The answer to whether the City's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

160.    If the named Plaintiffs succeed in their claims that the City's policies and practices concerning post-arrest wealth-based detention and debt collection for fines, fees (excluding "warrant recall fees", "letter fees", and/or "failure to appear fees", as defined in *Watkins v. City of Florissant*, No. 16SL-CC00165 (St. Louis Co. Cir. Ct. filed Jan. 2016)), costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

**D.      Adequacy: Fed. R. Civ. P. 23(a)(4).**

161.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to,

those of the Classes. There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

162.    Plaintiffs are represented by attorneys from ArchCity Defenders,[17] who have experience in litigating complex civil rights matters in federal court. They have both knowledge of the City's scheme and relevant constitutional and statutory law and extensive knowledge of the functioning of the municipal court system in the City of Florissant through their representation of numerous impoverished people in the City of Florissant. Plaintiffs are also represented by attorneys from Tycko & Zavareei, LLP, a national law firm based in Washington, DC, specializing in class action litigation on behalf of plaintiffs. The attorneys at Tycko & Zavareei, LLP have extensive experience litigating class action cases on behalf of plaintiffs in state and federal courts, including civil rights actions and actions against government entities.

---

[17] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in cases involving the Municipal Defendants for the past five years and is an expert on the ways in which the Defendants' illegal practices and policies make and keep people poor.  ArchCity Defenders has recently brought class actions in the Eastern District of Missouri restricting the use of chemical munitions on peaceful protesters, is co-counsel on two federal class actions alleging the operation of debtors' prisons in Ferguson and Jennings, Missouri, two additional class actions ending cash bail, and an additional series of state class action suits alleging the imposition of illegal fees and fines in various municipal courts in the St. Louis County region. ArchCity Defenders has most recently filed class action litigation against 13 cities in the St. Louis region alleging the operation of debtors' prisons.  *See Thomas et al v. St. Ann, Missouri, City of et al*, 4:16-cv-01302; *Templeton v. Dotson,* 4:14-cv-01019; *Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015); *Powell v. City of St. Ann* 4:15-cv-840 (E.D. Mo. 2015); *Pierce v. City of Velda City*, 4:15-CV-570 (E.D. Mo. 2015); *White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis Co. Cir. Ct., Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).  ArchCity Defenders also published an extensive report detailing these practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant in August of 2014.  The report is available at www.archcitydefenders.org.

Both ArchCity Defenders and Tycko & Zavareei, LLP can and will dedicate the resources necessary to prosecute this case and to represent the plaintiffs and the proposed classes.

163.   The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, City employees, City jail inmates, families, attorneys practicing in the Florissant Municipal Court, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and jails.

164.   Counsel and their colleagues have also observed numerous courtroom hearings in the City of Florissant and in municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

165.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the City's scheme and with all of the relevant state and federal laws and procedures that can and should govern it. Counsel has also developed relationships with many of the individuals and families most victimized by the City's practices.

166.   The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**E.   Rule 23(b)(2)**

167.   Class action status is appropriate because the City, through the policies, practices, and procedures that make up its post-arrest wealth-based detention and traffic and ordinance debt-collection scheme, has acted and refused to act on grounds generally applicable to the Declaratory and Injunctive Classes. Thus, a declaration that people in the City cannot be held in

jail solely because they cannot afford to make a monetary payment will apply to each Class member. Similarly, a determination that Class members are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by the City for non-payment will apply to each Class member. The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by City prosecutors in connection with which they are jailed; that the City cannot collect debts from Class members in an onerous manner that violates and evades all of the relevant protections for other judgment debtors; that the jail conditions to which members of the class are exposed are inhumane and unconstitutional; and that the City cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty.

168.    Injunctive relief compelling the City to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the City's unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts or be subject to arrest by the City in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**F:     Rule 23(b)(3)**

169.    Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate. This case turns, for every Class member, on what the City's policies and practices were and on whether those policies were lawful.

170.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes; the City of Florissant applies its policies and practices uniformly to all arrestees, and has applied them uniformly to all named plaintiffs and all members of the classes without any individualized assessments. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of the City's policies and practices than individual suits by hundreds or thousands of City residents.

171.    The question of damages will also be driven by class-wide determinations, such as the policies, practices, and conditions at the City jail. To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed, and the objectively determinable amount each plaintiff and each member of the class paid out of pocket to the City to secure release from jail. Determining damages for individual Class members can thus typically be handled in a ministerial fashion, based on easily verifiable records of the length of unlawful incarceration and the City's payment records for members of the Jailed Class, and the amounts of money actually paid to the City for members of the Paid Fines Class. If necessary, focused and limited individual hearings on individualized Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

172.    The Plaintiffs seek the following relief and hereby demand a jury trial in this cause for all matters so appropriate.

## Claims for Relief

**Count One: Defendant City of Florissant Violated the Plaintiffs' Rights by Jailing Them for Their Inability to Pay the City, or by Forcing Them to Make Payments in Order to Avoid Jail, Without Providing an Indigence Analysis.**

173.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

174.     The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the government if that person is indigent and unable to pay. Defendant violated Plaintiffs' rights by jailing Plaintiffs when they could not afford to pay the debts allegedly owed from traffic and other minor offenses, and by forcing them to make payments in order to avoid jail, even where indigent. Defendant violated Plaintiffs' rights by imprisoning them, and by threatening to imprison them, without conducting any inquiry into their ability to pay and without considering alternatives to imprisonment as required by the United States Constitution. At any moment, a wealthier person in the Plaintiffs' position could have paid a sum of cash and been released from jail. Defendant's policy and practice of keeping Plaintiffs in its jail unless and until they are able to pay arbitrarily determined and constantly-shifting sums of money violates the Fourteenth Amendment.

**Count Two: Defendant City of Florissant Violated Plaintiffs' Rights by Imprisoning Them Without Appointing Adequate Counsel.**

175.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

176.     Defendant violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by jailing Plaintiffs during or following proceedings initiated by City prosecutors at which Plaintiffs did not have the benefit of counsel and did not knowingly, intelligently, and voluntarily waive counsel. The City's policy of not providing adequate counsel in proceedings in which indigent people are ordered to be

imprisoned in the City jail for non-payment, which are, in turn, based on payment plans arising from traffic and other violations at which the person was also unrepresented, violates the Sixth and Fourteenth Amendments to the United States Constitution.

**Count Three: Defendant City of Florissant's Use of Indefinite and Arbitrary Detention Violates Equal Protection and Due Process.**

177.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

178.    The Due Process Clause of the Fourteenth Amendment prohibits Defendant from jailing the Plaintiffs indefinitely and without any meaningful legal process through which they can challenge their detention by keeping them confined in the Defendant's jail unless or until they could make arbitrarily determined cash payments, or until City employees decided to release them for free. The Equal Protection and Due Process Clauses prohibit the City's arbitrary and indeterminate post-arrest detention as a result of the City's use of a pre-fixed cash bail schedule whereby initial cash release amounts were arbitrarily set without any inquiry into a person's ability to pay. As a result, those arrestees able to pay are released immediately while those who cannot pay are detained indefinitely without any meaningful legal process to inquire into their ability to pay the amounts demanded by the City.

**Count Four: The Deplorable Conditions in the Florissant Jail Violate Due Process and Constitute Impermissible Punishment.**

179.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

180.    The unsafe, unsanitary, inhumane, and dangerous conditions of confinement in the Florissant jail constitute impermissible punishment unrelated to serving any criminal judgment. Even if imposed after valid conviction, the conditions would constitute cruel and

unusual treatment. The deplorable and excessively harsh conditions in the Defendant's jail are unnecessary to accomplish any legitimate government objective and shock the conscience of any reasonable person concerned with human dignity and liberty.

**Count Five: Defendant City of Florissant's Use of Jail and Threats of Jail to Collect Debts Owed to the City Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions On Debtors Whose Creditor Is the Government Compared To Those Who Owe Money to Private Creditors.**

181.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

182.    The United States Supreme Court has held that, when governments seek to recoup costs of prosecution from indigent defendants, they may not take advantage of their position to impose unduly harsh methods of collection solely because the debt is owed to the government and not to a private creditor. Not only does the City place indigent people on generic and overly onerous payment plans lasting years or decades when the cases of wealthier people would be terminated, but by imposing imprisonment, repeated threats of imprisonment, indeterminate "payment dockets" for many years, extra and invalid fees and surcharges, and other restrictions on Plaintiffs, the City takes advantage of its control over the machinery of the City jail and police systems to deny debtors the procedural and substantive statutory protections that every other Missouri debtor may invoke against a private creditor. Many people like the Plaintiffs owing money to the City of Florissant on old judgments have to borrow money and go further in debt in order to pay off the City of Florissant because other non-government creditors are not permitted to jail them for non-payment of debt. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

**Count Six: Defendant City of Florissant's Policy and Practice of Issuing and Serving Invalid Warrants, Including Those Solely Based on Nonpayment of Monetary Debt, Violates the Fourth and Fourteenth Amendments.**

183.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

184.    The City's policy and practice is to issue and serve arrest warrants against those who have not paid their traffic debt. These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the City has prior knowledge that the person is impoverished and unable to pay the debts and possesses other valid defenses. These warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense. The City chooses to pursue warrants instead of issuing summons even when it has spoken to people on the phone or in person and has the opportunity to notify them to appear in court. The City's policy of allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants but refusing to clear warrants for indigent people who cannot afford those options is unlawful. Moreover, the City's policy and practice of not presenting arrestees in court or unreasonably delaying presentment for days or weeks for no legitimate reason is unlawful. These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

**Count Seven: Defendant City of Florissant's Extended Detention of Warrantless Arrestees Without a Neutral Judicial Finding of Probable Cause Based On Sworn Evidence Violates the Fourth and Fourteenth Amendments.**

185.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

186.    The Fourth and Fourteenth Amendments prohibit extended pretrial detention after a warrantless arrest without a finding of probable cause by a neutral judicial officer based on sworn evidence. The City routinely fails as a matter of policy and practice to make a neutral finding of probable cause and thus keeps people in jail for longer than 48 hours without a neutral

finding of probable cause based on sworn evidence. Because City policy is to negotiate cash bond and then to release people for free eventually if they cannot pay, it does not detain new arrestees for the purpose of any legal proceeding. Thus, the City's extended initial detention period for those who cannot afford to pay after warrantless arrest is unrelated to any legitimate government interest and entirely unconnected from any need to prepare for any probable cause or preliminary hearing because the City does not hold probable cause hearings or preliminary hearings or make any formal probable cause findings.

### Request for Relief

WHEREFORE, Plaintiffs request that this Court issue the following relief:

a.  A declaratory judgment that Defendant violates Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them because they cannot afford to pay the City and by imprisoning them without conducting any meaningful inquiry into their ability to pay or into alternatives to incarceration;

b.  A declaratory judgment that Defendant violates Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;

c.  A declaratory judgment that Defendant violates Plaintiffs' rights by holding them indefinitely in jail independent of any formal legal process;

d.  A declaratory judgment that Defendant violates Plaintiffs' rights by subjecting them to unconstitutional jail conditions;

e.  A declaratory judgment that Defendant violates Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

f.  A declaratory judgment that Defendant violates Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, without requiring a neutral probable cause finding for warrantless arrestees, and without providing pre-deprivation of liberty process where such process is easily available to the City for judgment debtors;

g. An order and judgment permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs;

h. A judgment compensating members of the Jailed Class for damages they suffered as a result of the City's unconstitutional and unlawful conduct in imprisoning them in violation of law;

i. A judgment compensating members of the Paid Fines Class for damages they suffered and restitution for money paid to the City as the result of unlawful fines, fees (excluding "warrant recall fees", "letter fees", and/or "failure to appear fees", as defined in *Watkins v. City of Florissant*, No. 16SL-CC00165 (St. Louis Co. Cir. Ct. filed Jan. 2016)), costs, or from cases in the City court and who have not been provided an opportunity to prove indigence;

j. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other relief this Court deems just and proper.

Dated: December 13, 2016                Respectfully submitted,


By: */s/ Thomas B. Harvey*
        Thomas B. Harvey (MBE #61734MO)
        Michael-John Voss (MBE #61742MO)
        Edward J. Hall (MBE #0012692IA)
        Blake A. Strode (MBE #68422MO)
        Nathaniel Carroll (MBE #67988MO)

        ARCHCITY DEFENDERS, INC.
        1210 Locust Street
        Saint Louis, MO 63103
        Tel:    (855) 724-2489
        Fax:    (314) 925-1307
        tharvey@archcitydefenders.org
        mjvoss@archcitydefenders.org
        bstrode@archcitydefenders.org
        ehall@archcitydefenders.org
        ncarroll@archcitydefenders.org

        and

        Jeffrey D. Kaliel (*pro hac vice*)
        Martin D. Quiñones (*pro hac vice*)

51

TYCKO & ZAVAREEI LLP
1828 L Street, NW – Suite 1000
Washington, D.C. 20036
Tel:    (202) 973-0900
Fax:    (202) 973-0950
jkaliel@tzlegal.com
mquinones@tzlegal.com

*Attorneys for Plaintiffs*